1  PACIFIC TRIAL ATTORNEYS
   A Professional Corporation
2  Scott J. Ferrell, Bar No. 202091
   sferrell@pacifictrialattorneys.com
3  4100 Newport Place Drive, Ste. 800
   Newport Beach, CA  92660
4  Tel: (949) 706-6464
   Fax: (949) 706-6469
5
   Attorneys for Plaintiff
6

7

8              UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

10

11 SONYA VALENZUELA, individually and       Case No. 2:23-cv-06112-WLH-MAA
   on behalf of all others similarly situated,
12                                            **FIRST AMENDED CLASS ACTION
           Plaintiff,                         COMPLAINT**
13
           v.
14
   WORLD WILDLIFE FUND, INC., a
15 Delaware nonprofit corporation d/b/a
   WWW.WORLDWILDLIFE.ORG,
16
           Defendant.
17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

**Defendant has secretly installed spyware on its website at www.worldwildlife.org (the "Website") to access visitor devices, extract personal data, and wiretap conversations conducted through the website chat feature. Defendant and the spyware companies then exploit their knowledge of visitors' identities, habits, and chat topics to bombard visitors with targeted marketing, including unwanted cold calls and e-mails.**

**Defendant does all of this without visitors' effective consent. As a result, Defendant has violated numerous laws.**

## JURISDICTION AND VENUE

1.      Defendant invoked this Court's removal jurisdiction. The Court also has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is at least minimal diversity because at least one Plaintiff and Defendant are citizens of different states. Indeed, based upon the information available to Plaintiff, there are believed to be at least 10,000 class members, each entitled to up to $5,000 in statutory damages, thus making the amount in controversy at least $50,000,0000 exclusive of interests and costs. *See* Cal. Penal Code § 637.2(a)(1).

2.      Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

3.      Defendant is subject to personal jurisdiction in California under Penal Code Section 502(j), which provides that a person who improperly accesses a computer in California from any jurisdiction is subject to personal jurisdiction in California. Defendant is also subject to jurisdiction under California's "long-arm" statute found at California Code of Civil Procedure Section 410.10 because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United

**FIRST AMENDED CLASS ACTION COMPLAINT**

States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of its website revenues from Californians, such that the Website "is the equivalent of having a brick-and-mortar store in California – a 'virtual store.'" *Thurston v. Fairfield Collectibles of Georgia, LLC*, 53 Cal. App. 5th 1231, 1240 (2020) (citing *Stomp, Inc. v. NeatO, LLC*, 61 F. Supp. 2d 1074, 1078 n.7 (C.D. Cal. 1999)).

## PARTIES

4.     Plaintiff is a resident of California. While physically within California in 2023, Plaintiff visited Defendant's Website using a smart phone and conducted a brief conversation with an agent of Defendant through the Website's chat feature. Plaintiff was not advised that the chat was monitored, intercepted, or recorded.

5.     Defendant is a conservation organization and internet fundraising juggernaut. Defendant also owns, operates, and controls the Website and raises money from it throughout the United States, specifically including and targeting California.

## FACTUAL ALLEGATIONS

**A.     The Right to Privacy Has Always Been a Legally Protected Interest in the United States.**

6.     Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law.").

7.     More specifically, privacy protections against the disclosure of certain kinds of sensitive personal information are embedded in California statutes and at common law. *See, e.g.*, *U.S. Department of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) ("The Ninth Circuit has repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017)

(finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients"); *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites); *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

8.     In short, privacy is—and has always been—a legally protected interest in many contexts, specifically including personal information. Thus, a defendant whose acts or practices violate consumer privacy inflicts an actionable "injury" upon an individual.

**B.     The Right to Privacy Includes The Right To Online Anonymity.**

9.     The right to privacy includes the right to anonymity online. *In Re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011). Indeed, the "free exchange of ideas on the Internet is driven in large part by the ability of Internet users to communicate anonymously." *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1093 (W.D. Wash. 2001).

10.     Consumer expectations regarding privacy reinforce the actionability of these rights. According to the Pew Research Center, nearly all Americans believe it is important to (1) be in control of who can get information about their online activities; (2) to not be tracked online without their consent; and (3) to be in control of what information is collected about them.

11.     Accordingly, most people do not want their private online browsing to be associated with their public offline identities. This is because online anonymity gives the freedom to investigate, explore, and research without fear of social repercussions. In addition, online anonymity helps prevent security breaches, surveillance and intrusive web-tracking.

**FIRST AMENDED CLASS ACTION COMPLAINT**

**C.    The De-Anonymization of Internet Users Poses a Serious Threat to Personal
Privacy and the Internet.**

12.    In simple terms, de-anonymization is a process that involves cross-referencing anonymized data with "commercially available information" ("CAI") obtained from grey data markets to reveal an individual's identity.  De-anonymization has been called the "the biggest privacy threat no one is talking about."[1]

13.    As the Director of National Intelligence explained in a January 22, 2022 report (approved for public release on June 5, 2023) (the "DNI Report"), "the volume and sensitivity of CAI have expanded in recent years mainly due to the advancement of digital technology, including location-tracking and other features of smartphones and other electronic devices, and the advertising-based monetization models that underlie many commercial offerings available on the Internet."

14.    The Director of National Intelligence concluded (1) that the existence of these practices poses a threat to national security since it is available to foreign governments since it "clearly provides intelligence value," and (2) that it "raises significant issues related to privacy and civil liberties."

15.    The Director of National Intelligence concluded that the "single most important point" is that the expansion of CAI is "increasingly powerful for intelligence and increasingly sensitive for individual privacy and civil liberties" such that the Intelligence Community "needs to develop more refined policies to govern its acquisition and treatment."

**D.    Defendant Uses "Identity Resolution" Spyware Tools to Access Every
Visitor's Device, Reveal Their Identities, and Publicize Their Personal
Information to Its Marketing Partners.**

16.    As noted above, internet users have the right to remain anonymous. Nevertheless, some companies sell website owners "identity resolution" spyware tools

---

[1] https://technoglitz.com/de-anonymization-is-the-biggest-threat-to-privacy-that-no-one-is-talking-about/ (last downloaded August 2023).

**FIRST AMENDED CLASS ACTION COMPLAINT**

to de-anonymize and surveil website visitors. Identity resolution is generally defined as "the ability to recognize an individual person, in real-time, by connecting various identifiers from their digital interactions across devices and touchpoints." *See* https://www.fullcontact.com/identity-resolution/ (last downloaded August 2023).

17. Identity resolution requires the collection of "technical markers" and other clues that digital visitors leave when they use the internet, even though most users "are trying to reveal as little information as possible." *See* https://venturebeat.com/ai/what-is-identity-resolution-its-benefits-challenges-and-best-practices/ (last downloaded July 2023). Those "technical markers" include routing information, locally stored data (sometimes called "cookies"), and idiosyncratic behavior of computers. The techniques have grown much more sophisticated over the years, and modern identity resolution algorithms rely upon dozens of types of details and digital footprints. *Id.*

18. In short, identity resolution providers aggregate visitor "touchpoints" containing anonymous identifiers to find links between the anonymous identifiers until the data compiled into a dossier about an anonymous individual can be linked to a specific individual by name, age, address, physical location, and more.

19. The following visual depiction shows an example of how identity resolution providers aggregate dozens of "touchpoints" to identify an anonymous internet user:



20.    In the above example, the identity resolution provider has aggregated and analyzed dozens of anonymous "touchpoints" to reveal the following about a previously anonymous internet user, Mary Smith:

*(a)* Full name *(Mary Smith)*

*(b)* Date of birth *(May 1, 1979)*

*(c)* Gender *(female)*

*(d)* Home address *(2345 Avenue C, Papillion Nebraska)*

*(e)* Marital Status and Family *(Married with two children)*

(f) E-mail address (*Mary.Smith@gmail.com*)

(g) Personal Cell Phone: *(111) 123-4567*

*(h)* Voter Registration Status *(Registered)*

(i) Interests *(Shopping, Cooking, Traveling, Reading, Science)*

(j) Employer *(Karen's Fireside, Inc.)*

(k) Title *(Vice President)*

(l) Work Hours *(Daily 9-5)*

21.    To identify each visitor, Defendant has deployed the following spyware tools on its website:

a. **FullContact:** FullContact's identity resolution spyware allows website owners to "Identify Anonymous Website Visitors" and "Easily recognize anonymous website visitors, personalize your website, and collect better data to increase conversions." *See* https://www.fullcontact.com/solutions/identify-anonymous-traffic/ (last downloaded August 2023). Full Contact claims that "Unlike others, our real-time API can deliver instant recognition of an individual" and that "No matter how much an individual's information changes, you will always be able to identify who they are." Finally, the company boasts that

1    their customers can "Confidently connect to a real person with an email

2    address, a phone number, a street address or a Mobile Ad ID."

3

4    b. **_Liveramp:_** LiveRamp's Identity Resolution Spyware "resolves disparate

5    identifiers into individuals or households across digital, mobile, and

6    connected TV into a unified view of the customer by "connecting

7    consumers' offline and online journeys across various touchpoints and

8    devices." *See* https://docs.liveramp.com/identity/en/rampid-identity-

9    resolution.html (last downloaded August 2023).

10    22.    Plaintiff visited Defendant's Website and communicated with Defendant

11    via Defendant's chat feature.  As a result of Defendant's use of identity resolution

12    spyware and intrusion onto Plaintiff's device, Defendant: (1) obtained the IP address of

13    Plaintiff; (2) identified Plaintiff's name, location, e-mail, browsing history, and other

14    personal information; and (3) embedded Plaintiff's identity into the spyware companies'

15    extensive databases, which the spyware companies sell to other companies that

16    purchase their spyware.

17    23.    As a result of Defendant's wrongful conduct: (1) Plaintiff has been de-

18    anonymized and Plaintiff's personal information has been added to an extensive

19    spyware database; (2) Plaintiff has been bombarded with targeted advertising, e-mails,

20    and telephone calls; (3) Plaintiff can no longer surf the web anonymously; and (4)

21    Plaintiff has been exposed to heightened risk of identity theft.

22    24.    In short, Defendant has deprived Plaintiff of numerous important privacy

23    rights protected under California common law and statutes.  Defendant's conduct

24    amounts to "doxing by deanonymization" and robs Plaintiff of anonymity and

25    obscurity.  *See* _Doxing: A Conceptual Analysis, Ethics and Information Technology_,

26    Volume 18, pages 199–210 (2016).

27

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

**E.    Defendant's Further Violation of California Invasion of Privacy Act.**

25.    Defendant also allows a spyware company to wiretap and eavesdrop upon class member communications through the website chat feature in violation of California law.

26.    CIPA prohibits both wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication.  "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device").  "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

27.    Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.

28.    Unlike most companies, Defendant *ignores* CIPA.  Instead, Defendant enables and allows the third parties to eavesdrop on all such conversations.  Why? Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service.  At your fingertips, you have valuable customer insight to make informed business decisions. . . .When people are chatting, you have direct access to their exact pain points.*").  *See* https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited August 2023) (emphasis added).

29.    To enable the eavesdropping, Defendant allowed a company called SalesForce to covertly embed code into Defendant's chat feature.

30.    The secret code is a type of automatic routing software that automatically

acquires and transmits user chat communications to SalesForce without any active input from Defendant's employees. The code enables and allows SalesForce to secretly intercept in real time, eavesdrop upon, and store transcripts of Defendant's chat communications with unsuspecting website visitors – even when such conversations are not intended by such visitors to be disseminated beyond the intended recipient. Defendant neither informs visitors of this conduct nor obtains their effective consent to these intrusions.

31.    One might reasonably wonder why SalesForce would be interested in intercepting and recording the website chat interactions between Defendant and unsuspecting visitors to Defendant's Website.  As shown below, it all about money.

32.    SalesForce's chat software is "integrated" with Meta, Inc.'s subsidiaries like Facebook and WhatsApp.  (Integration allows various software sub-systems to share data to operate as a unified system).  According to Bloomberg.com, this is all part of Meta's secret "***plan to profit from private chats.***"  As Bloomberg explained, Meta's software integration "*can manage customer messages from multiple services on one central dashboard. That's central to Meta's plan to make money off of its two messaging apps, WhatsApp and Messenger.*"  See https://www.bloomberg.com/news/articles/2022-02-15/meta-closes-1-billion-kustomer-deal-after-regulatory-review (last downloaded August 2023).

33.    So how does it work?  ***First***, Meta identifies "user interests" by monitoring a collection of "offsite" user activity such as website visits and interactions (including private chat communications between Defendant and visitors) by "integrating" its software with SalesForce and the Identity Resolution Spyware Companies identified above.  ***Second***, Meta and the Identity Resolution Spyware Companies generate revenue based on their ability to identify anonymous internet users, along with their habits, preferences, and interests.  ***Third and finally***, after the chat transcripts intercepted by SalesForce, visitors are bombarded with targeted advertising.

34.    Through the preceding acts, Meta's boasts that it will "Transform your

**FIRST AMENDED CLASS ACTION COMPLAINT**

support center into a profit generator by bulk messaging specific customer segments based on your unique data…to reengage dissatisfied customers." *See* https://www.kustomer.com/product/customer-service/ (last downloaded May 16, 2023/link since disabled).

35.    Indeed, all of the schemers – Defendant, SalesForce, Meta, and the Identity Resolutions Spyware Companies – profit from secretly exploiting their ability to identify anonymous individuals who have visited Defendant's website. How? Because "*Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand. . . .Social media targeting helps brands leverage consumers' behavior on the web, search engines, and social media sites to present ads that reflect consumer interests.*"[2]

36.    SalesForce does more than merely provide a storage function for Defendant regarding Website users' chat communications with Defendant. As shown above, SalesForce uses its record of Website users' interaction with Defendant's chat feature to enable targeted marketing by Defendant and the Identity Resolution Spyware Companies.

37.    Plaintiff visited Defendant's Website using a smart phone (a cellular telephone with integrated computers to enable web browsing). As such, Plaintiff conversations through the website chat feature was transmitted from "cellular radio telephony" as defined by CIPA.

38.    By definition, Defendant's chat communications from its Website are transmitted to website visitors by either cellular telephony or landline telephony. *See* https://www.britannica.com/technology/Internet ("How does the Internet work?") ("*The*

---

[2] *See* https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Targeted%20advertising%20allows%20brands%20to,and%20engage%20with%20the%20brand (last visited May 16, 2023).

*Internet works through a series of networks that connect devices around the world through telephone lines.*") (last visited August 2023) (emphasis added).

39.    Defendant did not inform Class members that Defendant was secretly allowing, aiding, and abetting SalesForce to intercept and eavesdrop on the conversations during transmission, or that SalesForce provided data from such transcripts to Meta and the spyware companies through "integration" with Meta software.

40.    Defendant did not obtain class members' effective consent for the preceding intrusions, nor were class members aware of Defendant's conduct.

## CLASS ALLEGATIONS

41.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons within the state of California who within the statute of limitations period: (1) visited Defendant's website; and were exposed to the wrongful conduct described above.**

42.    NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the tens of thousands. The exact identities of Class members may be ascertained by the records maintained by Defendant.

43.    COMMONALITY: Common questions of fact and law exist as to all Class members, and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a.    Whether Defendant engaged in the wrongful conduct described above;

b.    Whether Plaintiff and Class members are entitled to statutory penalties; and

c.    Whether Class members are entitled to injunctive relief.

44.    <u>TYPICALITY</u>: As a person who visited Defendant's Website, whose privacy was invaded and whose electronic communication was recorded, intercepted and eavesdropped upon, Plaintiff is asserting claims that are typical of the Class.

45.    <u>ADEQUACY</u>: Plaintiff will fairly and adequately protect the interests of the members of The Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

46.    <u>SUPERIORITY</u>: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## FIRST CAUSE OF ACTION

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 631(a)

47.    "Any person who, by means of any machine, instrument, or contrivance, or in any other manner, [i] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [ii] who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or

things mentioned above in this section, is punishable by a fine . . . ." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1080 (C.D. Cal. 2021) (Holcomb, J.) (line breaks and headings of clauses added for ease of reference) (quoting Cal. Penal Code § 631(a)).

48.    Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiff's and the Class's electronic communications with Defendant's Website.  "Though written in terms of wiretapping, Section 631(a) applies to Internet communications.  It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.'" *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. 2022); *Yoon*, 549 F. Supp. 3d at 1080 ("Courts agree … that CIPA § 631 applies to communications conducted over the internet.") (citing *Matera v. Google Inc.*, 2016 WL 8200619, at *18 (N.D. Cal. Aug. 12, 2016) (Koh, J.) (holding that second clause of section 631(a) "encompasses email communications, which pass over wires, lines, or cables")); *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *21 (N.D. Cal. Sept. 26, 2013) (Koh, J.) ("the Court finds that section 631 of CIPA applies to emails"); *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 826 (N.D. Cal. 2020) (Labson Freeman, J.).

49.    The software embedded on Defendant's Website to record and eavesdrop upon the Class's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.  *See In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 937 (N.D. Cal. 2015) (stating that "***it is undeniable that a computer may qualify as a 'machine'***" within the meaning of section 631(a)) (emphasis added), *aff'd in part and rev'd in part on other grounds*, 956 F.3d 589 (9th Cir. 2020).

50.    At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Class Members with Defendant's Website to be recorded.  Defendant also aided and abetted, agreed with, employed, or conspired with

SalesForce to wiretap and/or eavesdrop upon such conversations during transmission and in real time by voluntarily embedding the software code.

51.    Defendant knows that SalesForce captures the electronic communications of visitors to Defendant's Website, and pays SalesForce to conduct these activities.

52.    Plaintiff and Class Members did not expressly or impliedly consent to any of Defendant's actions.

53.    In a materially identical case, a court recently held that the above-described allegations state viable claims for violations of section 631(a) of CIPA.  *See Byars v. The Goodyear Tire & Rubber Co.*, No. 5:22-cv-01358-SSS-KKx, 2023 WL 1788553, at *4 (C.D. Cal. Feb. 3, 2023) (Sykes, J.) ("*Byars contends that Goodyear, using a third-party service, "intercepts in real time" a website visitors' chat conversation. . . . Byars alleges that, using the chat conversation, website visitors share sensitive personal information. . . . Because Byars has pled sufficient facts to show the contents of the communications and that the communications were intercepted, Byars has sufficiently stated a claim under § 631(a).*") (emphasis added).

54.    Defendant's conduct constitutes numerous discrete violations of Cal. Penal Code § 631(a), entitling Plaintiff and/or Class Members to injunctive relief and statutory damages.

## SECOND CAUSE OF ACTION

### Violations of the California Invasion of Privacy Act

### Cal. Penal Code § 632.7

55.    Section 632.7 of California's Penal Code imposes liability upon anyone "who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone."

56. Plaintiff and the class members communicated with Defendant using telephony subject to the mandates and prohibitions of Section 632.7.

57. Defendant's communication from the chat feature on its Website is transmitted via telephony subject to the mandates and prohibitions of Section 632.7.

58. As set forth above, Defendant recorded telephony communication without the consent of all parties to the communication in violation of Section 632.7.

59. As set forth above, Defendant also aided and abetted a third party in the interception, reception, and/or intentional recordation of telephony communication in violation of Section 632.7.

60. In a materially identical case, a court recently held that the above-described allegations state viable claims for violations of section 632.7 of CIPA. *See Byars v. The Goodyear Tire & Rubber Co.*, No. 5:22-cv-01358, 2023 WL 1788553, at *5 (C.D. Cal. Feb. 3, 2023) (Sykes, J.) ("*Byars' alleged communication with Goodyear occurred via Goodyear's chat feature on its website. Byars accessed Goodyear's website using her smartphone. As smartphones are cellular phones with web capabilities, Byars' smartphone falls within the cellular phone category. . . . Because Byars' contends that users of Goodyear's website "share highly sensitive personal data" via Goodyear's chat feature, Byars has sufficiently alleged that website users had a reasonable expectation of privacy and therefore the communications fall within the scope of § 632.7.*") (emphasis added and internal citations omitted).

61. Defendant's conduct constitutes numerous discrete violations of Cal. Penal Code § 632.7, entitling Plaintiff and/or Class members to injunctive relief and statutory damages.

## THIRD CAUSE OF ACTION

## CALIFORNIA'S COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT

## PENAL CODE SECTION 502

62.    California's Comprehensive Computer Data Access and Fraud Act ("CDAFA") makes it unlawful for parties to obtain data from a computer user outside of the scope of the user's authorization.

63.    Specifically, Penal Code Section 502(c) imposes liability on any entity that "[k]nowingly accesses and without permission":  (1) uses any computer data, in order to "wrongfully control or obtain" computer data, (Cal. Penal Code § 502(c)(1), or (2) "makes use of any data from a computer…," (Cal. Penal Code § 502(c)(2)).

64.    CDAFA provides a private right of action for compensatory damages, punitive damages, and attorneys' fees to any individual harmed by its violation.  (Cal. Penal Code § 502(e)(1), (2), (4); *see Facebook, Inc. v. Power Ventures, Inc.*, 844 F. Supp. 2d 1025, 1038 (N.D. Cal. Feb. 16, 2012) (granting plaintiff's motion for summary judgment), *aff'd in relevant part*, 844 F.3d 1058, 1069 (9th Cir. 2016).

65.    By knowingly installing the Identity Resolution Spyware to access class member devices and extract their personal information, Defendant violated CDAFA. *See United States v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015) (violation of CDAFA to access device and use data improperly); and *Gilbert v. City of Sunnyvale*, 130 Cal. App. 4th 1264, 1281 (2005) (accessing and without permission making use of any data from computer system violates CDAFA).

## FOURTH CAUSE OF ACTION

## CALIFORNIA INVASION OF PRIVACY

66.    Article I, § 1 of the California Constitution provides, "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

67.    The phrase "and privacy" was added by an initiative adopted by California voters on November 7, 1972 (the Privacy Initiative). The Privacy Initiative created a private right of action against nongovernmental entities for invasions of privacy.

68.    The California Supreme Court has explained that one of the principal "mischiefs" to which the Privacy Initiative was directed was "the overbroad collection and retention of unnecessary personal information by government and business interests." *White v. Davis*, 13 Cal. 3d 757, 775 (Cal. 1975).

69.    Defendant's conduct in secretly accessing class member devices, gathering highly personal details about them and their browsing history, and sharing that information with spyware companies amounts to doxing and violates class members' rights to privacy.

70.    Defendant assisted the spyware companies to create entailed dossiers of class members and then share it with and sell it to numerous other companies.

71.    Class members have the right to privacy in their web-browsing history; in how personal information is going to be used; in the right to withhold and not disclose personal information; and all statutory privacy rights codified under federal and California law.

72.    Defendant has intruded on these privacy interests.

73.    Defendant's actions constitute a serious invasion of privacy in that they violate several state laws; disclosed sensitive personal information to third parties; and facilitated the disclosure of class member information by third parties who did not have legal access to their personal information.

74.    Defendant acted with oppression, fraud, or malice.

75.    Class members have been damaged by Defendant's invasion of privacy and are entitled to just compensation in the form of actual and punitive damages.

## FIFTH CAUSE OF ACTION

### INTRUSION UPON SECLUSION

76.    A claim for intrusion upon seclusion requires (1) intrusion into a private place, conversation, or matter; and (2) in a manner highly offensive to a reasonable person.

77.   Defendant intentionally intruded upon class members' solitude and seclusion by: (1) secretly accessing their devices to install identity resolution spyware without their knowledge or permission; and (2) mining their personal data and sharing it with spyware companies.

78.   As set forth above, the right to online privacy is both actionable and expected by consumers.   As such, Defendant's brazen de-anonymization of class members was highly offensive to all reasonable persons.

79.   None of Defendant's actions were authorized.

80.   Defendant violated state criminal and civil laws designed to protect individual privacy and against theft.

81.   Defendant has acted with oppression, fraud, or malice.

82.   Class members are entitled to just compensation in the form of actual damages and punitive damages under this cause of action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.   An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class counsel;

2.   An order declaring Defendant's conduct violates the above-referenced laws;

3.   An order of judgment in favor of Plaintiff and the Class and against Defendant on the causes of action asserted herein;

4.   An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

5.   Statutory, actual, and punitive damages;

/ / /

/ / /

/ / /

/ / /

**FIRST AMENDED CLASS ACTION COMPLAINT**

6.     Reasonable attorneys' fees and costs; and

7.     All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

Dated:  August 8, 2023                    PACIFIC TRIAL ATTORNEYS, APC

                                          By: _/s/ Scott J. Ferrell_____
                                          Scott. J. Ferrell
                                          Attorneys for Plaintiff

**FIRST AMENDED CLASS ACTION COMPLAINT**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2023, I electronically filed the foregoing **FIRST AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

*/s/Scott J. Ferrell*
Scott J. Ferrell

**FIRST AMENDED CLASS ACTION COMPLAINT**